4 U.S. 402
 4 Dall. 402
 1 L.Ed. 884
 Penn's Lessce
v.
Klyne.
 Circuit Court, Pennsylvania District.
 October Term, 1805
 
 1
 By an act of the General Assembly of Pennsylvania, passed on the 27th day of November 1779 (1 vol. State Laws, 622. Dall. edit.) the estates of the late proprietaries were vested in the commonwealth, subject to the following proviso:
 
 
 2
 'Sect. 8. Provided also. That all and every the private estates, lands and hereditaments, of any of the said proprietaries, whereof they are now possessed, or to which they are now entitled, in their private several right or capacity, by devise, purchase or descent; and likewise all the lands called and known by the name of the proprietary tenths or manors, which were duly surveyed, and returned into the Land-office, on or before the fourth day of July, in the year of our Lord one thousand seven hundred and seventy-six, together with the quit or other rents, and arrearages of rents, reserved out of the said proprietary tenths or manors, or any part or parts thereof, which have been sold, be confirmed, ratified and established for ever, according to such estate or estates therein, and under such limitations, uses and trusts, as in and by the several and respective reservations, grants and conveyances thereof, are directed and appointed.'
 
 
 3
 The present suit, and a number of other ejectments, were brought for tracts of land, lying in York county; in all of which, the general question was, whether the land was included in a tract called and known by the name of a proprietary manor, duly surveyed and returned into the land-office, on or before the 4th day of July 1776?
 
 
 4
 The title of the lessor of the plaintiff to the premises in dispute, was regularly deduced from the charter of Charles the 2d to William Penn,[1] provided there was a manor called and known by the name of Springetsbury, duly surveyed and returned, according to the terms and meaning of the act of November 1779.
 
 
 5
 The material facts, upon the controverted point, were these: At the time that Sir William Keith was governor of the province, the controversy between the proprietor and Lord Baltimore had arisen; and many persons from Maryland intruded upon the adjacent lands in Pennsylvania. Under the pressure of these intrusions, Sir William, on the 18th of June 1722, issued a warrant to John French, Francis Worley and James Mitchell, in which he recited, 'that the three nations of Indians on the north side of Susquehanna are much disturbed, and the peace of the colony in danger, by attempts to survey land on the south west bank of the river, over against the Indian towns and settlements, without any right, or pretence of authority, so to do, from the proprietor, unto whom the lands unquestionably belong; that it is agreeable to treaty and usage to reserve a sufficient quantity of land, on the south-west side of the Susquehanna, within the proprietor's land, for accommodating the said Indians: and that the Indians had requested, at a treaty, held on the 15th and 16th instant, that a large tract of land, right against their towns on Susquehanna might be surveyed for the proprietor's use only; because, from his bounty and goodness, they would always be sure to obtain whatsoever was necessary and convenient for them, from time to time.' Sir William's warrant then proceeded, that 'by virtue of the powers wherewith he is entrusted for the preservation of his majesty's peace in this province, and with a due respect and regard to the propietor's absolute title, and unquestionable rights, he directs and authorises, the persons named in the warrant, to cross and survey, mark and locate, 70,000 acres in the name and for the use of Springet Penn Esq., which shall bear the name, and be called the manor, of Springetsbury: beginning upon the south-west bank, over against Conestogoe creek; thence W. S. W. 10 miles; thence N. W. by N. 12 miles; thence E. N. E. to the uppermost corner of a tract called Newberry; thence S. E. by S. along the head line of Newberry, to the southern corner tree of Newberry; thence down the side line of Newberry E. N. E. to the Susquehanna; and thence down the river side to the place of beginning: And to return the warrant to the governor and council of Pennsylvania.' The survey being executed on the 19th and 20th of June, was returned to the council, on the 21st of June 1722, according to the following boundaries: 'From a red oak, by a run's side, called Penn's run, marked S. P. W. S. W. 10 miles to a chesnut by a run's side called French's run, marked S. P.; thence N. W. by N. to a black oak marked S. P. 12 miles; thence E. N. E. to Sir Wm. Keith's western corner tree in the woods 8 miles; thence along the S. E. and N. E. lines of Sir Wm. Keith's tract called Newberry to the Susquehanna; and thence along the river side to the place of beginning; containing 75,520 acres.'
 
 
 6
 Sir William Keith having commounicated these proceedings to the council, on the second of July 1722, it was thereupon declared, that 'so far as they concerned, or touched, with the proprietary affairs, they were not judged to lie before the Board;' which acted as a council of state, and not as commissioners of property. Col. French (one of the surveyors who executed the warrant) then undertook to vindicate the conduct of Sir Wm. Keith to the council, stating that 'the warrant specified his true reasons; and that it was, under all circumstances, the only effectual measure, for quieting the minds of the Indians, and preserving the public peace.' The warrant and survey, however, could not be returned into the land-office at that time; for, it was said, that the land-office continued shut from the death of W. Penn in 1718, until the arrival of T. Penn in 1732: nor does it appear, that they were ever filed in the land-office, at any subsequent period.
 
 
 7
 In order to resist the Maryland intrusions, encouragement was offered by Sir W. Keith, and accepted, by a number of Germans, for forming settlements on the tract, which had been thus surveyed; and in October 1736, Thomas Penn having purchased the Indian claim to the land, empowered Samuel Blunston to grant licences for 12,000 acres (which was sufficient to satisfy the rights of those who had settled, perhaps, fifty in number) within the tract of land 'commonly called the manor of Springetsbury,' under the invitations of the governor. But in addition to such settlers, not only the population of the tract in dispute, but of the neighbouring country, repidly increased.
 
 
 8
 The controversy with Maryland was finally settled in the year 1762, at which time James Hamilton was governor of the province; and, on the 21st of May of that year, he issued a warrant of re-survey, in which it was set forth, 'that in pursuance of the primitive regulations, for laying out lands in the province, W. Penn had issued a warrant, dated the 1st of September 1700, to Edward Pennington, the surveyor general, to survey for the proprietor, 500 acres of every township of 5000 acres; and, generally, the proprietary one tenth of all lands laid out, and to be laid out, that like warrants had been issued by the successive proprietaries to every succeeding surveyor general; that the tracts surveyed, however, are far short of the due proportions of the proprietary; that, therefore, by order of the then commissioners of property, and in virtue of the general warrant aforesaid to the then surveyor general, there was surveyed for the use of the proprietor on the 19th and 20th of June 1722, a certain tract of land, situate on the west side of the river Susquehanna, then in the county of Chester, afterwards of Lancaster, and now of York, containing about 70,000 acres, called and now well known by the name of the manor of Springetsbury; that sundry Germans and other afterwards seated themselves by leave of the proprietor on divers parts of the said manor, but confirmation of their title was delayed on account of the Indian claim; that on the 11th of October 1736, the Indians released their claim, when (on the 30th of October 1736) a license was given to each settler (the whole grant computed at 12,000 acres) promising patents, after surveys should be made; that the survey of the said tract of land is either lost, or mislaid; but that from the well known settlements and improvments made by the said licenced settlers therein, and the many surveys made round the said manor, and other proofs and circumstances, it appears that the said tract is bounded E. by the Susquehanna, W. by a north and south line west of the late dwelling plantation of Christian Elstor, called Oyster, a licenced settler, N. by a line nearly east and west distant about three miles north of the present great roads, leading from Wright's ferry through York-Town by the said Christian Oyster's plantation to Monockassy; S. by a line near east and west distant about three miles south of the great road aforesaid; that divers of the said tracts and settlements within the said manor, have been surveyed and confirmed by patents, and many that have been surveyed remain to be confirmed by patents, for which the settlers have applied; that the proprietor is desirous, that a complete draft, or map, and return of survey of the said manor shall be replaced and remain for their and his use, in the surveyor general's office, and also in the secretary's office; that by special order and direction a survey for the proprietor's use was made by Thomas Cookson, deputy surveyor (in 1741) of a tract on both sides of the Codorus, within the said manor, for the scite of a town, whereon York-Town has since been laid out and built, but no return of that survey being made, the premises were re-surveyed by George Stevenson, deputy surveyor (in December 1752) and found to contain 436 1/2 acres.' After this recital the warrant directed the surveyor general 'to re-survey the said tract, for the proprietor's use, as part of his one-tenth, in order that the bounds and lines thereof may be certainly known and ascertained.' On the 13th of May 1768, the governor's secretary, by letter, urged the surveyor general to make a survey and return of the outline of the manor at least; the survey was accordingly executed on the 12th and 30th of June; and the plat was returned into the land-office, and, also, into the secretary's office on the 12th of July 1768, containing 64,520 acres; a part of the original tract of 70,000 acres having been cut off, under the agreement between Penn and Baltimore, to satisfy the claims of Maryland settlers.
 
 
 9
 On the trial of the cause, evidence was given on each side, to maintain the opposite positions, respecting the existence or non-existence of the manor of Springetsbury, from public instruments; from the sense expressed by the proprietaries, before the revolution, in their warrants and patents; from the sense expressed by the warrants and patents issued since the revolution; from the practice of the land-office; and from the current of public opinion.
 
 
 10
 The general ground taken by the plaintiff's counsel (E. Tilghman, Lewis, and Rawle) was, 1st. That the land mentioned in the declaration is a part of a tract called, or known by the name of a proprietary manor. 2d. That it was a proprietary manor duly surveyed, within the true intent and meaning of the act of the general assembly. And, 3d. That the survey was duly made and returned before the 4th of July 1776.
 
 
 11
 The defendant's counsel (M'Kean, attorney general, Hopkins and Dallas) contended, 1st. That Sir Wm. Keith's warrant being issued in 1722, without authority, all proceedings on it were absolutely void; and that neither the warrant, nor survey, had ever been returned into the land-office. 2d. That governor Hamilton's warrant was issued in 1762, to re-survey a manor, which had never been legally surveyed, and was, in that respect, to be regarded as a superstructure without a foundation. 3d. That the recitals of governor Hamilton's warrant are not founded in fact; and that considering the survey, in pursuance of it, as an original survey, it was void, as against compact, law, and justice, that the proprietor should assume for a manor, land, that had been previously located and settled by individuals.
 
 
 12
 The following charge was delivered to the jury:
 
 
 13
 WASHINGTON, Justice.
 
 
 14
 In this cause there are two questions, 1st. Have the lessors of the plaintiffs a title to the land in question. If they have, 2d. Has the defendant a better right?
 
 
 15
 1st. The lessors of the plaintiffs, or those under whom they claim, were once the sole owners and proprietaries, not only of the government, but of the soil, of Pennsylvania, not in a political, but in their private and individual capacities; not as trustees for the people, as to the whole, or any part of the soil, but in absolute fee simple, for their individual uses, and this right was no otherwise defined, by concessions on agreements, by William Penn, or his descendants, than to render them trustees for such individuals, as should acquire equitable rights, to particular portions of land, under general or special promises, rules and regulations, which they may, from time to time, have entered into and established.
 
 
 16
 Their right to appropriate lands to their own use, was not derived from, or founded upon, any such rules or concessions, but flowed from their original chartered rights, which bestowed upon them the whole of the soil. But as it was their interest to encourage the population and settlement of the province, they erected an office, and laid down certain rules for its government, and the government of those who might wish to acquire rights to the unappropriated lands in the province, reserving to themselves a right to appropriate one tenth of the whole to themselves, for their private and individual uses. From hence the following principles resulted: that all persons, complying with the terms thus held out, acquired a right to the proportion of land, thus appropriated, not only against other individuals, who might thereafter attempt to appropriate the same land, but even against the proprietor himself, unless he had previously, and by some act of notoriety, evidenced his intention to withdraw such land from the general mass of property, and to appropriate it to his individual use. As a necessary consequence of this principle, whenever such was his intention, or was made known by a warrant of appropriation and a survey, to make out, and locate the ground thus withdrawn, this was notice to all the world, that no right to the land, thus laid off for the proprietaries, could be acquired by individuals, without a special agreement with the proprietaries, which might, or might not, be upon the common terms, as the proprietors might choose. But if before such special appropriation by the proprietaries, an individual had, in compliance with the office rules, appropriated a tract, within the bounds of the tract thus laid off for the proprietaries, such prior appropriation, would no otherwise affect the rights of the proprietaries, than in relation to the particular tracts thus claimed. His right to the residue, remained unaffected. On this ground the right of the first proprietor stood at the time of his death, and so continued to exist, in his legal representatives, until the year A. D. 1779, when a law of this state was passed, divesting the proprietaries of all their estate, right and title, in, or to, the soil of Pennsylvania, and vesting the same in the Commonwealth. But in this law, certain portions of land, within the Commonwealth are excepted, and the right of the proprietaries, to such portions, is confirmed and established forever. The lessors of the plaintiffs, who most undoubtedly are entitled to all the rights of the proprietaries, are compelled to date their title, from this law; and therefore it is necessary for them to show, that the land in question, is part of a tract of land, called and known by the name of a proprietary-tenth or manor; which was duly surveyed, and returned into the land-office, on or before the 4th of July 1776.
 
 
 17
 They are to prove, 1st, that this was in 1779 called and known by the name of a proprietary-tenth or manor. The words of the law are peculiar. As to their private rights, they must be such whereof they were in 1779 possessed, or to which they were entitled. But as to the tenths or manors it was sufficient if they were known by that name, and had been surveyed and returned, before the 4th of July 1776. These expressions respecting the manors, were rendered necessary, to avoid giving the word manor a technical meaning; for there were no manors, in a legal acceptation of the word, in this state, but there were many tracts of land appropriated to the separate use of the proprietaries, to which this name had been given. The first inquiry therefore, under this head, is, was the land in question part of a tract of land called, and known as a manor, in the year 1776 or 1779? To prove this fact, the licences granted by Thomas Penn, in 1736, to about 50 settlers, in different parts of the first, as well as second, survey, in which this is called the manor of Springetsbury, is strongly relied upon, to show, that, even at that early period, it had acquired this name: The tenor of the warrants afterwards granted for lands within this manor, varying from the terms of the common warrants, and this variance proved by witnesses, as marking this for manor land: The testimony of witnesses to show that the west line of this manor was always reputed to go considerably beyond York to Oyster's. The practice of surveyors and public officers, whenever warrants were issued to survey lands in the manor. But even if this tract of land had never acquired the name of a manor, prior to 1768, the survey made of it in that year, as a manor, is conclusive. From that period it acquired, by matter of record, the name of a manor; and so it appears, by the evidence in the cause, it was called and known.
 
 
 18
 2d. Was it duly surveyed and returned into the land office before the 4th of July 1776? That it was surveyed in 1768, is admitted; but, it is contended, that it was not duly surveyed. It is so contended, because it was surveyed in 1722. That survey it is said, was void, because made without authority, was not executed by the surveyor general, and was returned into the council of state's office. That survey then being void, it is said, vitiates the survey of 1768: the former being considered as the foundation, and the latter as the superstructure. The survey of 1768 is executed, it is argued, under a warrant of re-survey in 1762, and consequently the repetition of an act which has no validity, cannot give it validity. It is further argued, that the recital of the loss of the survey of 1722, is a mere pretence, a fraud, to enable the proprietaries to exchange bad land for good. Now I do not understand this kind of logic: it is far too refined for the sober judgment of men who have to decide. If the invalidity of the first survey can have any effect upon the second, I should suppose it would establish it beyond all doubt; because, if the first survey was good, and if the warrant of 1762 was merely an order to retrace the lines of that survey, the counsel might, with some plausibility at least, argue that the surveyor was bound to pursue the lines of the lines of the former survey; and this would give colour to his observations, founded on the mistake of the public officers, as to the proper lines of the survey. But if the first survey was unauthorized, and utterly void, then the second could not, in the nature of things, be a resurvey. Whatever words were used in the warrant, there is no magic in that word. If there never was a former survey, there could be no resurvey; and consequently the survey, of 1768, was an original survey, founded on a special warrant, making out the lines and bounds, by which the surveyor was to go, and such is the fact in this case, although the survey of 1722, is referred to in the warrant of 1762, yet the lines to be surveyed under this second warrant, are specially described. To those he was confined, and had he departed from them, the survey would, unless it was rectified by acceptance, have been void, as against the proprietary, and he might have directed it to be made against. It is not denied, but that the survey of 1768, is in conformity with the warrant. It was accepted as a valid survey, and I cannot see upon what ground the defendants, or any other person, can now say, that it was void. Had not the proprietary a right to appropriate to his private use, the land included within the survey of 1768, in part of the tenth, which he had always reserved to himself? And if the warrant and survey makes the appropriation, what does it signify, whether there was a prior survey or not? or whether it was good or bad? True, if previously to the warrant of 1762, third persons had acquired a right to parcels of this land, or had done so afterwards, and before the survey in 1768, (but without notice of the warrants,) the proprietaries would have been bound to make them titles, upon their complying with the terms of the grants to them. But this could not impeach his title to the residue of the land, comprehended within the lines of the survey. Upon the whole then, the court is of opinion, that this manor was duly surveyed; and it is admitted, that the survey was returned into the land office, before the 4th of July 1776. If so, the plaintiffs' title is unquestionable.
 
 
 19
 2d. Has the defendant a better title? He claims by warrant, in 1747, regularly brought down to him, for 95 acres. He has no patent, but yet by the common law of this state, a warrant and survey, if the consideration be paid, is considered a legal title against the proprietary, as much so as if he had a patent. If the consideration be not paid, then the legal title is not out of the proprietaries; but still the warrant holder has an equitable title, which it is in his power to render a legal one, by paying what is due to the proprietaries. No proof is given of payment by the defendant, or any one of those under whom he claims, but you are called upon to presume it from length of time. Now in a case of this sort, there is no room for presumption, the very circumstance of the defendant appearing in court without a patent, or without shewing, or pretending, that any ever was granted, destroys the presumption, which length of time might have created. For if he had paid, he would have been entitled that moment to a patent: the one was the necessary consequence of the other. Men might long forbear to call for this confirmation of their titles, from the inconvenience of paying the consideration, but that he should pay, and not go on to perfect his title, is altogether improbable, and certainly not to be presumed; but if the jury could presume any thing from length of time, yet that presumptions may be repelled and in this case is.
 
 
 20
 The deed of 1771, from Pence, the grantee, to Shultz, proved that he had not paid, and the deed from Shultz's executors to Siump, in 1794, that it was not then paid. The defendant, therefore, has not a legal title to authorize a verdict in his favour; but he has an equitable title, and may compel a grant, upon paying, or tendering, what is due to the plaintiffs, with costs of this suit. And if the plaintiffs should then refuse, this court sitting in equity, would compel them, at the expence of paying costs. In the state court, I understand, the jury may make a kind of special or conditional finding, in consequence of the having no court of equity. But this court having equitable jurisdiction, your verdict must be general.
 
 Verdict for the Plaintiffs.[2]
 
 
 [1]
 The original charter was given in evidence upon the trial.
 
 
 [2]
 As some of the persons, interested in the ejectments brought for lands in Springetsbury manor, had purchased from the state; and as the state would be entitled to all arrears of purchase money, if the proprietary title should not be established; the legislature bad authorised the governor to employ counsel to assist the counsel of the defendants. After the decision of the above case, the legislature appointed James Ross and James Hopkins, Esqrs, to take defence in the next ejectment, Penn's lessee v. Groff, which was tried in April term 1806; and upon the same charge, the same verdict was given. The defendant's counsel, having tendered a bill of exceptions, to the charge of the court, arrangements were made to obtain a final decision in the Supreme Court, upon a writ of error. It appears, however, from the journals, that the legislature is not disposed to interfere any further; and, I have been informed, that terms of compromise have been proposed, and accepted, by the parties.