CITY OF GALVESTON V. GERALD C. MANN, ATTORNEY GONERAL.

Motion No. 14,664. Decided October 23, 1940.
(143 S. W., 2d Series, 1028.)

320

*Bryan F. Williams,* of Galveston, for relator.

On the question of whether the proceeds of the $300,000.00 general obligation bonds may be used to help defray the expenses of the improvements which are to be mortgaged to secure the million dollars revenue bonds relator cites: City of Dayton v. Allred, 123 Texas 60, 68 S. W. (2d) 173; Kuhn v. Detroit, 164 Mich, 369, 129 N. W. 879.

The submerging of lands previously under private ownership does not destroy the rights or title of such owners. In re City of New York (Realty Associates), 256 N. Y. 217, 176 N. E. 171.

*Gerald C. Mann,* Attorney General, *Clarence E. Crowe, Claude O. Boothman* and *George W. Barcus,* Assistants Attorney General, for respondent.

MR. CHIEF JUSTICE MOORE delivered the opinion of the Court.

This is an original proceeding by the City of Galveston, as relator, against Gerald C. Mann, Attorney General, as respondent, in which it prays that a writ of mandamus issue requiring the Attorney General to approve two series of bonds, of relator, one in the total amount of three hundred thousand dollars, which are to be general obligations of the City payable from proceeds of taxes to be levied by the City, and the other in the total amount of one million dollars, to be payable solely from the income and revenues arising from the operation of properties which relator proposes to construct with their proceeds. The Attorney General has refused to approve these bonds upon ground that will hereinafter be stated.

By agreement, this proceeding has been heard upon relator's motion to file petition for the writ of mandamus and upon the merits, and it has been submitted upon oral arguments and briefs by both parties.

It is alleged in relator's petition for mandamus that the territory of the City embraces the eastern end of Galveston Island, with a frontage upon the Gulf of Mexico along which there exists a seawall with a wide, paved boulevard adjacent thereto upon the inland side of the seawall, and that the beach and waters of the Gulf of Mexico are upon the outer side; that because of its location upon the shores of the Gulf, the City is highly attractive to tourists who, to the extent of many thousands, visit it annually and particularly during the summer months, seeking rest, amusements, and diversions offered by a seashore resort; that there are not available to relator desirable or suitably located tracts of upland along the beaches and adjacent to the waters of the Gulf upon which it is reasonably practicable for relator to locate and maintain a park or place containing facilities to afford fishing and other sports for the large number of its visitors, as well as its own inhabitants, but that such facilities may be adequately and attractively provided "by constructing them upon a suitable pier or elevated structure extending from the shore into and over the waters of the Gulf of Mexico which, in addition to providing in the best manner, places for rest, comfort, diversions and amusements and other sports for the public, will provide a place for fishing in the deeper waters of the Gulf in a manner superior to any other which could be reasonably employed to afford opportunities for such sport to the members of the public desiring to engage in the same."

Relator states that in seeking to provide such facilities, the City has entered into a tentative agreement with the Reconstruction Finance Corporation, whereby that corporation has agreed to loan one million dollars for the construction of such improvements against revenue bonds of the City, but upon condition that the City supply from other sources any funds, not exceeding three hundred thousand dollars, which may be necessary to defray any cost of constructing and equipping the facilities in excess of one million dollars.

It is provided between the City and the Finance Corporation that these bonds shall be "additionally secured by a Deed of Trust, constituting a first mortgage upon the real estate, fixtures and chattel property of the Facilities." The granting clause of this proposed deed of trust describes the properties to be mortgaged, as follows:

"The certain tract or parcel of land in the City of Galveston, County of Galveston, Texas, bordering upon the Gulf of Mexico and lying south of the southerly boundary of the .Galveston County Seawall right-of-way, between two lines extending into the waters of the Gulf of Mexico parallel with the extensions of the east and west lines of Twenty-Fifth Street, sometimes known as Rosenberg Avenue, one of such lines beginning at a point on the southerly or shoreward boundary of the Galveston County Seawall right-of-way, three hundred and forty (340) feet east of the intersection of an extension of the east line of said Twenty-Fifth Street with such boundary of such right-of-way, and the other of such lines extending from a point on such boundary of such right-of-way, three hundred and forty (340) feet west of the intersection of an extension of the west line of said Twenty-Fifth Street with such boundary of such right-of-way, together with all and singular all riparian rights and privileges and all other rights and privileges in anywise incident or appurtenant to such land and to any part thereof, and all titles, easements, rights, privileges, permits and interest of any character in, to or upon any adjacent land, submerged land and waters acquired or hereafter acquired by the City of Galveston for use and occupancy in the erection, construction, maintenance and operation of the improvements hereinabove described and designated as the Facilities and further any and all improvements made and to be made upon the above described land and in, over or upon waters adjacent thereto by the City of Galveston constituting the Facilities, or used in connection therewith."

This indenture also contains provisions for the sale by the named trustee, or substitute trustee, of the properties upon the happening of any one or more events constituting defaults as therein defined, and that upon any such sale the trustee shall execute and deliver to the purchaser a conveyance of the properties so sold, and that the purchaser thereunder shall have and is granted by the City a franchise to operate such facilities for a period of twenty years.

Both the series of bonds in the amounts above stated have been authorized by the action of the City Council and by the vote of the qualified voters of the City. No question is raised as to the regularity of these proceedings by the Attorney General.

The Attorney General bases his objections to the issuance of these bonds on the ground that it appears that the entire proceeds of both these issues are to be used in the erection of

a pier out into the Gulf of Mexico, and that no portion of such improvements will be on land owned by the City of Galveston or of which it has control; but to the contrary, the land on which the City proposes to erect such improvements is submerged land in the Gulf of Mexico which belongs to the State of Texas, and that relator has no power "to mortgage any portion of the Gulf of Mexico to secure the bond indenture."

The relator and the respondent have filed what is called an "Agreed State of Facts," which simplifies to some extent the fact questions involved in this proceeding, and which is here quoted in full, viz:

"The parties agree that the seawall at the place where the pier will be built at Galveston is built approximately 500 feet from what was some twenty years ago the high tide of the Gulf of Mexico; that after the seawall was built, about 1905, the high tide of the Gulf about twenty years ago came up to said seawall and constantly since said time all of the land lying on the Gulf side of the seawall at the place where the pier is intended to be built has been within the high tide waters of the Gulf.

"The County of Galveston has lying immediately adjacent to and on the outer side of the seawall a strip of land approximately ninety (90) feet wide which it acquired as a right-of-way for said seawall; that about 594 feet from said 90 feet and to the seaward thereof the property was originally above the high tide of the Gulf; that the City of Galveston expects to obtain the right-of-way or permission from Galveston County and from the parties who formerly owned the land that was above the original high tide either by purchase or by gift for the purpose of constructing said proposed pier.

"That the proposed pier to be built will extend from the land acquired or to be acquired by relator approximately 500 or 600 feet into the Gulf of Mexico beyond what was originally the high tide and the funds received from the sale of the bonds will be used to build the entire pier as one unit and said pier will be, when completed, approximately 1200 feet in length and extend to the deep water in the Gulf of Mexico and with the exception of the fishing platform at the end thereon will be about 27 feet above the surface of the water. That the fishing platform will be at the extreme end of Pier out in the Gulf and will be about 310 feet long and about 40 feet wide and about —— feet above the surface of the water."

Relator in his written reply to the answer of the Attorney General, while not disputing the State's ownership of the bed

of the ocean at the applicable place, nevertheless contends that it does not follow that the City in the event it becomes the owner of the land adjacent to the ocean bed, now owned by the State, cannot, as appurtenant to its littoral or riparian rights, when thus acquired, "build its pier out into and over the ocean bed and waters in front of its land."

Following the last quoted statement, relator says:

"By amendment to relator's petition it is shown that there is land over which approximately one-half the pier will be built which though now submerged has been in the past upland, not submerged and under private ownership of owners claiming under valid grant. And it is further shown that relator intends to acquire ownership of that land, or in the case of the seawall right-of-way to use and occupancy, and establish a park thereon and build its pier for approximately one-half its length over and upon the same with the balance of the pier extending from such lands into the waters of the Gulf.

"It is relator's contention:

"(1) That the rights of the owners in the above mentioned land which have become submerged in the manner stated in the petition, that is, suddenly by or as aftermath of violent hurricanes or storms have not been lost.

"(2) That the owners of such lands have littoral or riparian rights in the water and ocean beds which they adjoin, which rights include the right to occupy such adjacent ocean beds and waters with such a structure as relator proposes to erect thereon, which rights relator intends to acquire and exercise."

Since the submission of this proceeding, and on October 10, 1940, relator has filed, with the permission of the Court, an additional brief, by which it further contends that the Legislature has already invested the City of Galveston with the power to permit such a structure as relator proposes to construct by virtue of Section 40 of the City's charter granted by special act of the Legislature in 1905, which reads as follows:

"The Board of Commissioners shall have power to regulate and determine the time and place of bathing and swimming in the waters adjoining or within said city and to prevent any obscene or indecent exposition, exposure or conduct; to regulate by general ordinance the character and construction and prohibit the use for any improper or unlawful purpose of bath houses, pavilions, restaurants, fishing piers and other structures in the waters adjacent to the beach of the city; to regulate the construction of approaches to such structures so as not

to unreasonably obstruct or interfere with the drive on said beach * *."

Relator says that the City has thus been granted by the Legislature the power to permit the occupancy of the public waters and ocean bed by such a structure as the one here involved, in that the above quoted act constitutes a grant from or permission by the State to erect and maintain structures of the kind therein named into the public waters adjacent to the City of Galveston.

■ It is established law that mandamus will not issue to compel a public officer to perform an official act unless the relator has shown a clear legal right to its performance at the hands of such officer. The object of the writ is to enforce the performance of the duty when the relator has no other adequate means of redress, and it is further shown that the officer has clearly violated his duty in not performing the act sought to be required of him. It follows that the writ will not issue if the right is doubtful or contingent upon further acts of relator or others. And it has been held that this is particularly the case where the interest of third persons are involved. These principles were well announced in the case of Common School District No. 16, Lampasas County, v. Keeling, Attorney General, 113 Texas 523, 261 S. W. 364. In that case the School District filed with the Supreme Court a petition for mandamus to require the Attorney General to approve the issuance of bonds by said district, which the Attorney General had theretofore refused to approve. In brief, the facts were that the Commissioners' Court of Lampasas County on June 8, 1921, ordered an election in said district to determine whether or not the bonds in question should be issued. The vote for such bonds was favorable, but in the meanwhile and about one month subsequent to the date of such order but before the issuance of the bonds, a portion of said Common School District was annexed to an Independent School District, and the Independent School District had also issued a series of bonds. The reason which the Attorney General then gave for refusing to approve the bonds of the Common School District was that a portion of the territory which had formerly been included in that district ceased to be a portion of that district and had been annexed to the Independent School District, and that by approval of the bonds the taxpayers of this added territory would be subject to double taxation. In the opinion written by Chief Justice Cureton, the Court said:

"It is elementary that a public officer will not be mandamused

unless he has a clear legal duty to perform. * * In the instant case the Attorney General would have been compelled to hold that the territory taken from Common School District No. 16, and added to the Evant District, was not lawfully incorporated within the latter District. This holding would necessarily have been a holding without authority of law to enforce it, and would not have been binding upon the Evant District, nor any of its inhabitants. * *

"It is clear, we think, that the Attorney General would not have authority to approve the bonds for Common School District No. 16, until, and unless, a direct action is brought in the proper court and the added territory severed from the Evant District by a court decree, * * Since the annexation of the added territory was at least de facto, its integrity could not be questioned by the Attorney General in an ex parte proceeding before him for the approval of bonds of another district; nor can it be challenged in this proceeding, which is a collateral one."

In the case of Holcomb v. Robison, Commissioner of General Land Office, 118 Texas 395, 15 S. W. (2d) 1027, relator had filed in the Supreme Court a petition for mandamus praying for the issuance of a writ requiring the Land Commissioner to approve the field notes of a certain parcel of land lying contiguous to the south bank of Red River in Cooke County, which was alleged to be unappropriated public free school land. The Gainesville Red River Bridge Company, a corporation, and a private individual were also named as respondents in the petition. The Court said:

"It is clearly apparent that the pleadings present an issue of fact necessary to be determined by a court of competent jurisdiction, in order that the lawful rights of the Relator may be ascertained with respect to this land. Relator alleges the land is a part of the public domain, belonging to the unappropriated public free school fund. Respondents allege it is private property, the title to which is evidenced by a valid patent. Mandamus will not issue to compel a public officer to perform an official act unless the complaining party shows a clear right to such performance and a clear duty to perform by the officer. Neither the right nor the duty can be thus shown, where an issue of fact is raised by the pleadings, duly authenticated. This being the situation the Supreme Court has no jurisdiction of the suit, which should be dismissed."

And in the case of Teat v. McGaughey, Commissioner of General Land Office, 85 Texas 478, 22 S. W. 302, the Court

said that it was clearly of the opinion that the right of manda-
mus was intended neither by the Constitution nor by the
statute to confer jurisdiction upon this Court to try a case
on mandamus in which the act which is sought to be compelled
may involve the determination of a doubtful question of fact;
that the machinery of the Court was not adapted to the trial
of such a cause; and that it was not intended that the Supreme
Court should exercise that jurisdiction in any case, "unless the
officer was under a clear legal obligation to do the act, and the
right to have it performed was not dependent upon the de-
termination of any doubtful question of fact." See also Texas
Jurisprudence, Vol. 28, p. 533 et seq., where the authorities
quoted from and many others are listed.

For reasons that are convincing, as will hereinafter be
shown, the State is, at the least, the apparent owner of the
tide lands over which the relator proposes to erect these struc-
tures, as well as being the unquestioned owner of the land
beneath "the deep waters of the Gulf," over which such struc-
ture is also proposed to be erected.

■ The State in its sovereign capacity is not a party to this
proceeding; nor are the alleged "former owners" of such tide
lands. In any contest between the State and such claimants,
issues of law and fact which cannot be here determined would
necessarily be invoked in such a trial.

It is pertinent here to review briefly the legal history of
the State's ownership of the waters and submerged lands of the
Gulf of Mexico. On December 19, 1836, it was enacted by the
Senate and the House of Representatives of the Republic of
Texas that from and after the passage of that Act, the civil
and political jurisdiction of the Republic was declared to extend
to the following boundaries, to wit: "Beginning at the mouth
of the Sabine river, and running west along the Gulf of Mexico
three leagues from land, to the mouth of the Rio Grande, thence
up the principal stream of said river to its source, thence due
north to the forty-second degree of north latitude, thence along
the boundary line as defined in the treaty between the United
States and Spain, to the beginning." Gammel's Laws of Texas,
Vol. 1, p. 1193. In the Resolution of the Congress of the United
States pertaining to the Annexation of the Republic of Texas
as a State into the Federal Union, of date March 1, 1845, it
was provided that the Republic retained for the State "all the
vacant and unappropriated lands lying within its limits," sub-
ject only to the superior rights of navigation of the Federal
government in the navigable waters of the State. Article 4026,

R. C. S. 1925, which is a re-enactment of a prior statute, provides, in part, as follows:

"All of the public rivers, bayous, lagoons, creeks, lakes, bays and inlets in this State, and all that part of the Gulf of Mexico within the jurisdiction of this State, together with their beds and bottoms, and all of the products thereof, shall continue and remain the property of the State of Texas, except in so far as the State shall permit the use of said waters and bottoms, or permit the taking of the products of such bottoms and waters, * *."

Article 7467, R. C. S. 1925, provides, in part, as follows:

"The waters of the ordinary flow and underflow and tides of every flowing river or natural stream, of all lakes, bays, or arms of the Gulf of Mexico, and the storm, flood or rain waters of every river or natural stream, canyon, ravine, depression or watershed, within the State, of Texas, are hereby declared to be property of the state, * *."

This Court in many important decisions has zealously guarded and enforced the rights of this State to the public lands of the State as provided and guaranteed to it in the foregoing resolutions of the Republic of Texas, the resolutions of the United States Congress appertaining to the annexation of the Republic of Texas, and in the Acts passed by the Legislature of the State of Texas. And by virtue of Article 5416, R. C. S. 1925, which is a re-codification of an older statute, this Court has also many times held that the lands included "in lakes, bays, and islands along the Gulf of Mexico within tidewater limits" are exempt from the unappropriated public domain set aside for public school purposes, and that all such lands are held in trust by the State for the benefit of all the inhabitants of the State. One of the latest expressions of the Court on that subject is contained in the case of the State of Texas et al. v. Bradford, 121 Texas 515, 50 S. W. (2d) 1065, where, in an opinion written by Sharp, J., then a member of the Supreme Court Commission and now a member of this Court, it was said:

"The rule has long been established in this State that the State is the owner of the soil underlying the navigable waters, such as navigable streams, as defined by statute, lakes, bays, inlets *and other areas within tide water limits within its borders.*"

In the case of Crary v. Port Arthur Channel & Dock Co., 92 Texas 275, 47 S. W. 967, where, in answering a contention

made in that case as to what is included in the term "the waters of the gulf," the Court said:

"The contention seems to be made that by 'the waters of the gulf' is meant the gulf itself. But we think the language in question is far more comprehensive than it would have been had the statute read 'from the Gulf of Mexico.' We are clearly of the opinion that the terms are sufficiently broad to embrace at least all bays, inlets, and streams upon the gulf coast to the *extent to which they are subject to the ebb and flow of the tide."* (All italics ours.)

■ We therefore repeat that the fundamental principle underlying the title and rights of the State in lands under navigable waters, including the land subject to the ordinary ebb and flow of the tides, is held by the State in trust for all the people, and that the words "public lands" in the statute conferring rights upon individuals will be held not to apply to the soil under navigable waters, that is to say, that the trust so imposed upon the State with respect to its title to such lands necessarily withdraws the same from the operation of the general provisions conferring upon the Land Commissioner the right to contract for the sale or lease of public school land. In addition to the cases cited, see De Merit v. Robison, Commissioner, 102 Texas 358, 116 S. W. 796; Landry v. Robison, Com'r. Gen. Land Office, 110 Texas 295, 219 S. W. 819; Galveston v. Menard, 23 Texas 349; Hynes v. Packard, 92 Texas 44, 45 S. W. 562; Galveston City S. B. Co. v. Heidenheimer, 63 Texas 559; State v. Jadwin (Tex. Civ. App.), 85 S. W. 490 (writ refused) ; Economy Light & Power Co. v. United States, 256 U. S. 113, 65 L. Ed. 847; Tex. Jur., Vol. 34, p. 20 et seq. Hence, title to such lands may only be acquired, if at all, by grant expressly authorized by the Legislature of the State. Galveston v. Menard, supra.

It appears from the "Agreed State of Facts," and also as argued by relator on submission, that the City of Galveston does not claim to be the present owner of the land underlying any of the waters of the Gulf of Mexico on and over which the City proposes to construct these extensive improvements, which are to extend from the seawall, at right angles, a distance of twelve hundred feet out into the Gulf of Mexico; but that it is proposed by the City to obtain a right of way or permission to so much of said land as has thus been subjected to the tides for twenty years, first, from the County of Galveston to the extent of ninety feet adjoining the seawall, and the balance of the tide land "from the persons who formerly owned the land that

was above the original high tide either by purchase or by gift," and that such persons are claiming under a valid grant. As we interpret relator's further position, it is, that having once acquired the tide lands from such "former owners," the City will thereby become a riparian owner of the land bordering on the deep waters of the Gulf, and then as an asserted incident to its riparian rights, it will be authorized to construct said pier or improvements over the waters of the Gulf of Mexico and on the land beneath such waters the additional distance of five or six hundred feet without obtaining any right from the State so to do.

■ The Court is of the opinion and here holds that the erection of a structure such as relator proposes to build, of the size and dimensions as above outlined, and at a distance of six or seven hundred feet over and under the tide waters of the Gulf, and at the further distance of approximately six hundred feet into the deep waters of the sea, would be an encroachment, at the least, upon the prima facie property rights of the sovereign, that is, the State, so far as the tide lands are concerned, and an encroachment upon the unquestioned property rights of the State in so far as such structure is proposed to be projected out into the deep waters of the sea. Such a structure in legal phraseology would constitute a purpresture, which would be subject to be removed at the instance of the State, whether the same should tend to obstruct navigation or otherwise. Petty v. City of San Antonio (Tex. Civ. App.), 181 S. W. 224 (writ refused) ; Weber v. State Harbors Com'rs., 85 U. S. 57, 65, 21 L. Ed. 798; Shively v. Bowlby, 152 U. S. 1, 38 L. Ed. 331; Williams v. Guthrie, 107 Fla. 1047, 137 So. 682; Revell v. People, 177 Ill. 468, 52 N. E. 1052, 43 L. R. A. 790, 69 Am. St. R. 257; People v. Steeplechase Park Co., 218 N. Y. 459, 113 N. E. 521, 143 N. Y. S. 503, 1918B Ann. Cases, 1099; San Francisco Sav. Union v. Petroleum & Min. Co., 144 Cal. 134, 77 P. 823, 66 L. R. A. 242; Eisenbach v. Hatfield, 2 Wash. 236, 26 P. 539, 12 L. R. A. 632; Gray's Harbor Boom Co. v. Lownsdale, 54 Wash. 83, 104 P. 267; C. J., Vol. 51, pp. 104, 105.

■■ We have also given due consideration to relator's contention that the City already is invested with authority by virtue of the section of the charter above-quoted to erect and maintain structures of the kind which relator is desirous of constructing. In our opinion the City's charter does not invest the City with any such right, but the right thereby conferred is merely a police power which authorizes the City to regulate and police any structures now or hereafter built in the waters adjacent

to the beach of the City, whether within or without the corporate limits. The City is not authorized by the above-quoted section of its charter to construct anything, and it is not to be implied that the Legislature intended to give approval to any invasion of the rights of the State, but that if and when any such structure is built in the waters adjacent to the beach, the City shall have the right to police the same. The State's title to its lands cannot be bartered away by any such implication, as contended for by relator. Galveston City S. B. Co. v. Heidenheimer, 63 Texas 559. The State is the source of all title to land in this State, including the navigable waters of the State, and except in instances where a right not expressly granted but is so patently implied as to leave no room for reasonable doubt, as was discussed in the case of Humble Pipe Line Co. v. State, et al (Texas Court of Civil Appeals) 2 S. W. (2d) 1018, anyone claiming title to any particular portion of the State's property must show that the same has been segregated by some formal grant or purchase, and that it no longer forms a part of the State's public domain. Caples v. Cole, 129 Texas 370, 376, 102 S. W. (2d) 173; Producers' Oil Co. v. State, 213 S. W. 349; Welder v. State (Texas Court of Civil Appeals), 196 S. W. 868 (writ refused).

■ The evident purpose of Article 4398, R. C. S. 1925, and other relevant statutes which impose the duty upon the Attorney General to pass upon the validity of bonds proposed to be issued by any municipality or political subdivision of this State, is not only to protect the particular locality and its inhabitants against the imposition of unauthorized or illegal obligations, but also to give assurance to the State Board of Education and other intending purchasers of such bonds that if and when such bonds are so purchased, the purchaser will acquire an indefeasible title thereto. The duty thus imposed upon the Attorney General is important and is in no sense perfunctory. Another statutory duty is imposed upon the Attorney General by Article 5420, R. C. S. 1925, by which he is required to institute suit against any person holding or claiming land adversely to the State. Therefore, the Attorney General would default in his obligation to the State if he were to approve a bond record which showed that bonds were voted for the purpose of paying for the construction of permanent structures upon land which belongs to the State of Texas, or apparently belongs to the State, and for the erection of which structures no right or permit has been obtained.

The Court being of the opinion that the refusal of the Attorney General to approve the bonds in question must be sustained, it is therefore ordered that relator's motion to file petition for mandamus be and the same is hereby overruled.

Opinion delivered October 23, 1940.

MR. JUSTICE CRITZ, concurring.

As I understand this record, the structures proposed to be built by the City will extend over 594 feet of area that was once above high tide and privately owned until some twenty years ago. Some twenty years ago this area became submerged so as to become below high tide. It is not shown how this occurred, whether by evulsion or erosion.

I understand that the structures to be built by the city will, in addition to extending over the above-described 594-foot area, extend an additional 600 feet into the Gulf of Mexico.

I understand that the city contends that the area 594 feet wide, once above high tide but now suberged below high tide, is still privately owned. In other words, the city contends that the fact that such area is now below high tide, and has been for twenty years, has not caused those who owned it when it was above high tide to lose their title.

I further understand that the city proposes to acquire the title to the above-mentioned 594-foot area.

Finally, I understand that the city contends that it will have a right to erect and maintain its structure over the 594-foot area as owner thereof; and that as a riparian right attached to the 594-foot area, it will have the right to erect and maintain its structures for the additional 600 feet.

It is my opinion that neither the State nor the alleged private owners of the 594-foot area are necessary parties to this action to compel the Attorney General to approve these bonds.

It is further my opinion that it cannot be said, as a matter of law, that the Attorney General violated a mere ministerial duty in refusing to approve these bonds. I think it is true even though it is my opinion that, as between the city and the bondholders, these bonds would be perfectly valid if approved by the Attorney General. In other words, I believe that the Attorney General has a lawful right to approve them.

I am of the opinion that this mandamus should not issue for the reason that I do not believe that this record contains enough agreed facts for this Court to say whether or not the 594-foot area is still privately owned. Furthermore, I do not believe that even should it be considered that the 594-foot area

is still privately owned, a question on which I express no opinion, yet I do not believe that this record shows that the city is in any position to lawfully assure those who may purchase these bonds that the structures it proposes to build will be permitted to remain for the length of time contemplated by the bond contract over the 600-foot area lying outside and adjacent to the 594-foot area. Simply stated, it is my opinion that the Attorney General has not abused his discretion in refusing to approve these bonds, even though it is my further opinion that under this record he could have exercised his discretion either way without acting unlawfully.

Opinion delivered October 23, 1940.