**TEXAS GENERAL LAND OFFICE and Jerry Patterson, in his official capacity as Texas Land Commissioner, Appellants,**

v.

**Sonya PORRETTO and Rosemarie Porretto, Appellees.**

**No. 01–09–00520–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 15, 2011.

---

Levon G. Hovnatanian, Bruce E. Ramage, Martin, Disiere, Jefferson & Wisdom, L.L.P., Houston, TX, for Appellants.

Andrew Mytelka, Stephen G. Schulz, Greer, Herz & Adams LLP, Kelly Ann Fayette Clarke, Galveston, TX, Jeffrey Wells Oppel, Oppel, Goldberg & Williams, P.L.L.C., Houston, TX, for Appellees.

Panel consists of Justices KEYES, HIGLEY, and BLAND.

## OPINION ON REHEARING

JANE BLAND, Justice.

A little more than fifty years ago, the Porretto family began acquiring tracts of beachfront property on Galveston Island, gulfward of the seawall. The family eventually came to own property along the shoreline between 6th and 27th Streets. They turned the property between 6th and 10th Streets into Porretto Beach and provided paid parking and concessions for beachgoers. They did not develop the tracts between 10th and 27th Streets, known as Porretto Beach West (PBW).

In 1994, the State, acting through the Texas General Land Office (GLO), leased the public land between 10th and 61st Streets—referred to in the lease as "submerged property"—to the City of Galveston for a beach replenishment project. Beginning in 2001, the Porrettos unsuccessfully attempted to sell their property. Citing a cloud on their title as the reason, the Porrettos then sued the GLO and Jerry Patterson, its commissioner, as well as several Galveston municipal officeholders. In the suit, the Porrettos alleged interference with their good title to beachfront property and a governmental taking of their land in violation of the Texas Constitution.

In our first encounter with this case, we reversed the trial court's ruling dismissing the case for lack of jurisdiction. *See Porretto v. Patterson*, 251 S.W.3d 701, 701 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (*Porretto I*). On remand, the State amended its jurisdictional plea and adduced evidence to support it. The trial court denied the amended plea and tried the title dispute and takings claim to the bench. The trial court quieted title in favor of the Porrettos. It further concluded that certain State actions amounted to a taking without adequate compensation, in violation of article 1, section 17 of the Texas Constitution. The trial court then submitted issues regarding property valuation and attorney's fees to a jury. The trial court entered a judgment on the jury's verdict and declared title to the contested property in favor of the Porrettos.

In this appeal, the State contends that the trial court lacked subject matter jurisdiction over the Porrettos' request for declaratory relief, because Commissioner Patterson was immune from suit for the functional equivalent of a trespass to try title claim. The State further contends that the trial court erred in concluding that the Porrettos own all of the contested property and that Chapter 61 of the Texas Natural Resource Code (the Open Beaches Act) is an unconstitutional ex post facto law. It challenges the trial court and the jury findings as legally insufficient. The State also appeals the trial court's imposition of discovery sanctions. We grant rehearing, withdraw our earlier opinion, and issue this one in its stead. Our disposition remains unchanged.

We conclude that the trial court erred in declaring that the Porrettos hold title to the contested property that is submerged under the Gulf of Mexico. As a result, the trial court erred in denying the State's amended plea to the jurisdiction with respect to this state-owned property. Because the Porrettos did not identify the scope of their private landholdings to exclude state-owned submerged land, the trial court's improper declaration of title is fatal to their inverse condemnation claims, as is the absence of any state action by these defendants that constitutes a taking. The trial court erred in entering judgment declaring the Open Beaches Act unconstitutional because the Porrettos' challenge to it was not ripe for adjudication. Finally, the trial court erred in imposing discovery sanctions against the State. We therefore reverse.

## Background

Henry Porretto acquired property along the Gulf shore between 6th and 27th Streets through a series of purchases beginning in 1959.[1] The title to these tracts traces back to the Menard Grant, an 1838 conveyance of the eastern end of Galveston

---

1. Henry Porretto died while this case has been pending. His daughter Sonya Porretto is the current owner of the property and assignee of her mother's claims.

by the Republic of Texas to Michael B. Menard. *See generally City of Galveston v. Menard*, 23 Tex. 349, 1859 WL 6290, *30, *32 (1859). When the Republic conveyed the property to Menard, the entire conveyance was dry land, but much of it is now submerged beneath the Gulf of Mexico.

In 1994, the City of Galveston—which is no longer a party to this case—embarked on a beach renourishment project to replenish and increase the size of the sandy area along the Gulf shore for public recreational use. To this end, the State entered into a ten-year lease with the City for "State *Submerged* Gulf of Mexico Tracts . . . adjacent to and along the Galveston Seawall from the centerline of 10th Street, extended, to the centerline of 103rd Street, extended." (emphasis added.) The lease includes a map that generally depicts the span of land included in the proposed beach replenishment project where the City later expected to deposit "beach quality sand in and on said *submerged* land for beach replenishment and restoration . . . ." (emphasis added.)

The lease recites that "[t]he uplands property littoral to the submerged lands subject to this lease are owned by the County of Galveston," and specifies that the lease has no effect on the county's rights or obligations to own and maintain the seawall. The lease also contains an agreement that the City of Galveston would:

cause surveys to be performed by a Licensed State Land Surveyor to locate and document the line of highest annual tide . . . continuing along the length of the submerged lands subject to this lease . . ., and the line of mean high tide along the length of the submerged lands subject [to the lease]. Each survey shall be subject to acceptance and approval by the [State].

During the project's development stage, a public dispute arose concerning the assertion of property rights on and around the affected part of the beach. In response to a public query about proposed jet-ski concessions, a GLO staff attorney wrote in a June 23, 1997 letter that:

the State does not recognize any claim of private ownership of land in front of the seawall. I have previously directed your attention to *Galveston v. Menard* and the cases cited therein and pointed out that the pre-project survey of the line of high water clearly shows it to be up on the seawall. The requirement of the park board that the concessionaire obtain consent of "certain adjacent property owners" and the recitations of the Consent form itself ascribe some credence to these specious claims in derogation of the State position and are, therefore, not acceptable.

As the dispute became more heated, the Galveston County Daily News published a series of articles regarding disputes over property ownership in front of the seawall, culminating in an opinion piece by the GLO's senior deputy commissioner and general counsel explaining that, based on the 1940 Texas Supreme Court case of *City of Galveston v. Mann*—"which found that there had been no fast land in front of the seawall for a period in excess of 20 years and recognized the State's ownership of the submerged land due to erosion"—the State took the position that it owned all of the property seaward of the seawall. *See* 135 Tex. 319, 143 S.W.2d 1028, 1033 (1940). Individuals representing the State made similar claims at several public meetings of the Galveston Park Board. The State directed the Galveston County Appraisal District [GCAD] to change their records to show state ownership of submerged lands.

In the meantime, the Porrettos made unsuccessful attempts to sell their property. In 2001, the Porrettos met with a group of investors that expressed interest in building a hotel and boardwalk on the Porretto Beach property. In 2006, the Porrettos again sought to sell Porretto Beach to a developer who was interested in constructing a high-rise condominium on the property. Concerns about present and future ownership of the beachfront, however, dissuaded the prospective purchasers.

The trial court found that the Porrettos held title to all of the Porretto Beach and PBW property that the Menard Grant originally had conveyed, including the portions of that property that undisputedly are submerged beneath the Gulf of Mexico. The trial court also held that the State's actions effected a taking of the Porrettos' property. The jury found the values of Porretto Beach and PBW, respectively, before and after the dates on which the trial court found that the taking had occurred. The trial court declared title in favor of the Porrettos and held that the Open Beaches Act was an unconstitutional ex post facto law whose regulations did not apply to the Porrettos' property. It also awarded the Porrettos the takings damages found by the jury, as well as their attorney's fees as a sanction in connection with a discovery dispute with the State. This appeal followed.

## Discussion

### I. Subject-matter jurisdiction

#### A. Standard of review

Subject-matter jurisdiction is essential for a court to have the authority to resolve a case, and a trial court lacks jurisdiction over a governmental unit that is immune from suit. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). A party may challenge a court's subject-matter jurisdiction by filing a plea to the jurisdiction. *See Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 639 (Tex. 1999). We review de novo a trial court's ruling on a jurisdictional plea. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex.1998). In our review we consider only the plaintiffs pleadings and evidence pertinent to the jurisdictional inquiry. *County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex.2002). We construe the pleadings liberally in favor of conferring jurisdiction. *Tex. Dep't of Transp. v. Ramirez*, 74 S.W.3d 864, 867 (Tex.2002). At the same time we are mindful that a plaintiff may not avoid sovereign immunity through artful pleading. *See City of Houston v. Williams*, 216 S.W.3d 827, 828–29 (Tex.2007) ("[P]rivate parties cannot circumvent the State's sovereign immunity from suit by characterizing a suit for money damages, such as a contract dispute, as a declaratory-judgment claim," and "if the sole purpose of such a declaration [regarding a governmental body's statutory authority] is to obtain a money judgment, immunity is not waived") (quoting *Tex. Natural Res. Conserv. Comm'n v. IT–Davy*, 74 S.W.3d 849, 856 (Tex.2002)).

A plaintiff bears the burden to allege facts affirmatively demonstrating the trial court's jurisdiction to hear the case. *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex.2003). To prevail on a plea to the jurisdiction, the defendant must show an incurable jurisdictional defect apparent from the face of the pleadings, making it impossible for any amendment of the plaintiff's petition to confer jurisdiction on the trial court. *Bybee v. Fireman's Fund Ins. Co.*, 160 Tex. 429, 331 S.W.2d 910, 917 (1960). We bear in mind that the government bears the burden to adduce evidence showing as a matter of law that the trial court lacks jurisdiction. *Porretto I*, 251 S.W.3d at 711

(citing *Tex. Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex.2004)).

### B. The challenged judgment

 The State charges that, despite the Porrettos' abandonment of their trespass-to-try-title claim against Commissioner Patterson, the trial court effectively adjudicated a claim against the State for land in favor of the Porrettos. A plaintiff may request declaratory relief to clarify a person's legal rights in relation to the State without implicating the State's immunity from suit. *Porretto I*, 251 S.W.3d at 708. Nor does sovereign immunity shield the State from a claim based on an unconstitutional taking of property. *Id.* (citing *State v. Holland*, 221 S.W.3d 639, 644 (Tex. 2007)); *Porretto I*, 251 S.W.3d at 708. But, if the prevailing party seeks title to, and possession of, the real property interest at issue in the suit, sovereign immunity bars the suit. *Id.*

The trial court's judgment declares:

1. That the [Porrettos] own fee simple title to the property at issue ... between 6th and 10th streets in front of (seaward of) the Galveston seawall above (landward) of the mean higher high tide line ...

2. That the [Porrettos] own fee simple title to the property at issue in this lawsuit between 6th and 10th Streets in front of (seaward of) the Galveston seawall below (seaward of) the mean higher high tide line....

3. That the [Porrettos] own fee simple title to the property at issue in this lawsuit between 10th and 27th Streets in front of (seaward of) the Galveston seawall above (landward of) the mean higher high tide line....

4. That the [Porrettos] own fee simple title to the property at issue in this lawsuit between 10th and 27th Streets in front of (seaward of) the Galveston seawall below (seaward of) the mean higher high tide line....

In addition to these declarations, the judgment holds the State liable for damages based on the jury's fair market value findings, but it does not require the Porrettos to relinquish the property to the State. The judgment confirms that the Porrettos' suit, at bottom, challenges the title and ownership of the property. The judgment attaches, and each of these declarations refers to, a property survey and a legal description of the properties. The trial court had subject-matter jurisdiction to adjudicate such a challenge only absent any showing that the State has a colorable claim to title, or as an antecedent and necessary finding to support a takings claim. As we further discuss, we conclude that the State has proved its title to the submerged land, and the Porrettos have not proved a taking of their dry land by the State or by Commissioner Patterson.[2] Because the State demonstrated immunity from suit, the trial court should have granted the State's amended plea to the jurisdiction on the Porrettos' request for a declaration that adjudicated title and property ownership against the State.

### C. The State's ownership by tidal boundary and the Menard Grant

The State asserted more than a colorable claim to title in its amended plea. In

---

**2.** In *Porretto I*, the Porrettos also asserted takings claims against certain Galveston municipal authorities in connection with beach concession agreements. *See Porretto v. Patterson*, 251 S.W.3d 701, 706 (Tex.App.-Houston [1st Dist.] 2007, no pet.). We do not address either these claims or the alleged actions underlying them, as the Galveston authorities are not parties to this appeal.

*Porretto I,* we reversed the trial court's grant of the State's initial plea to the jurisdiction as to Commissioner Patterson on the Porrettos' trespass-to-try-title claims because the State made no assertion of title. Following *State v. Lain,* 162 Tex. 549, 349 S.W.2d 579 (1961), we held that the trial court's decision was premature because Commissioner Patterson had not contested the Porrettos' claim of title or otherwise asserted that the State had a colorable, superior right to the land. *Porretto I,* 251 S.W.3d at 711; *see also Tex. Parks & Wildlife Dep't v. Sawyer Trust,* 354 S.W.3d 384, 389 (Tex.2011) (confirming vitality of *Lain* rule and applying it to determine that Trust's claims did not dispute boundary between State-owned land and Trust-owned land, but "whether State owned any land at all," and thus were barred by sovereign immunity). After the appeal, when the proceedings resumed, the State clarified its asserted property rights, explaining that it did not contest the Porrettos' ownership of the dry-land property seaward of the seawall and landward of the mean higher high-tide line, but it claimed ownership to the contested, now-submerged land—the land seaward of the mean higher high-tide line. The State also adduced evidence to support its right to title to the submerged land.

This evidence, presented at the evidentiary hearing on the amended plea, includes: (1) a copy of the Menard Grant; (2) survey maps delineating submerged land, submerged land later filled as part of the beach renourishment project, and upland property; and (3) the State's October 13, 1994 lease to the City of Galveston for the beach renourishment project. The lease to the City expressly conveys only the submerged property between 10th and 61st Streets—it does not convey any dry land. We examine this evidence to determine whether the State has asserted a colorable claim to title that rendered the trial court without jurisdiction to adjudicate the Porrettos' claim to title and possession of the property.

■ Within the Menard Grant, we find the answer. We have a longstanding duty to strictly construe legislative grants of property in favor of the State, preserving for the State any interest that is not conveyed in unequivocal and explicit terms. *Empire Gas & Fuel Co. v. State,* 121 Tex. 138, 47 S.W.2d 265, 272 (1932); *City of Galveston v. Tex. Gen. Land Office,* 196 S.W.3d 218, 226 (Tex.App.-Houston [1st Dist.] 2006, pet. denied). In particular, we do not presume that the State made a grant or sale that includes land under navigable waters unless the conveying instrument expressly provides for its inclusion. *See Lorino v. Crawford Packing Co.,* 142 Tex. 51, 175 S.W.2d 410, 413 (1943) (citing *Mann,* 143 S.W.2d at 1033).

■ The parties agree that we are to interpret the Menard Grant under Spanish civil law. Under the civil law, the nation owns the seashore, bays, and rivers absent the expression of a clear intent to the contrary. *See Menard,* 1859 WL at *30, *32. In *Menard,* the Supreme Court determined whether the grant could be properly construed to convey the submerged land between the Bay's shore and the channel. The call in the title specifies a distance out from the dry land to the channel of the harbor into the bay, creating fixed boundaries on the northern side facing Galveston Bay. *Id.* at *32. This area, which consisted of mud flats, was "regularly and periodically left bare, dry land, to the channel." *Id.* Considering the specific language of the grant and the legislature's expressed purpose for its authorization, the court concluded that the grant intended to convey the flats into the bay to the channel for the construction of wharves in the area. *Id.* at *24.

■ The *Menard* court addressed the description of the conveyance only as it pertains to the Bay side of Galveston Island. On the Gulf side—which includes the property at issue here—the Menard Grant does not specify a fixed distance seaward: it conveys land "to the meanders." "A meander line is a series of course and distance calls which follow the river or other natural object or monument as closely as is practically possible for purposes of calculating the amount of land conveyed." *Ely v. Briley,* 959 S.W.2d 723, 725 n. 1 (Tex.App.-Austin 1998, no pet.). A conveyance to the meanders, then, is a grant to the shoreline and does not include submerged land. *See City of Port Isabel v. Mo. Pac. R.R.,* 729 S.W.2d 939, 942–43 (Tex.App.-Corpus Christi 1987, writ ref'd n.r.e.).

■ Under the civil law, a conveyance to the meanders extends to the mean higher high-tide line.[3] *John & Stella Kenedy Mem'l Found. v. Dewhurst,* 90 S.W.3d 268, 270, 280 (Tex.2002) (relying on *Luttes v. State,* 159 Tex. 500, 324 S.W.2d 167, 175 (1958), and recognizing that *Luttes* was not limited to its facts; it "generally determine[d] shoreline boundaries under the civil law"); *TH Invs. Inc. v. Kirby Inland Marine, L.P.,* 218 S.W.3d 173, 184 (Tex. App.-Houston [14th Dist.] 2007, pet. denied). The conveyance along the Gulf shoreline thus does not include submerged land or land seaward of the mean higher high-tide line. *See John & Stella Kenedy Mem'l Found.,* 90 S.W.3d at 270, 280; *Luttes,* 324 S.W.2d at 175; *see also Lorino,* 175 S.W.2d at 414 (holding that Galveston City Council lacked power to grant exclusive rights to Gulf shore and surf for operation of private bathhouse because Menard Grant "stops with the shore," leaving right to enjoyment of waters and shores of Gulf to state and its citizens). "The soil covered by the bays, inlets and arms of the Gulf of Mexico within tidewater limits belongs to the State, and constitutes public property that is held in trust for the use and benefit of all people." *Id.* at 413.

■ Texas law recognizes that littoral boundaries can shift over time. "[W]hen the location of the margin or bed of a body of water that constitutes the boundary of a tract of land is gradually and imperceptibly changed or shifted . . ., the margin or bed of the body of water, as so changed, remains the boundary line of the tract, which is extended or restricted accordingly." *Brainard v. State,* 12 S.W.3d 6, 17–18 (Tex.1999); *see TH Invs.,* 218 S.W.3d at 185 (observing that boundary established by tideline moves over time and that "the location of the shoreline, wherever it may be at any given time, represents the boundary of a littoral owner's property"); *Natland Corp. v. Baker's Port, Inc.,* 865 S.W.2d 52, 57 (Tex.App.Corpus Christi 1993, writ denied) (observing that "an upland owner acquires or loses title to the

---

**3.** The Texas coast experiences two high tides daily, one of which is higher than the other. The mean high tide—used for calculating a shoreline boundary under the Texas common law—is an average, over the 18.6–year tidal cycle, of the tidal boundary's location using a calculation that accounts for the daily reach of both tides. The mean higher high-tide line—used in the civil law applicable to Spanish and Mexican land grants, as well as those of the Republic of Texas—is an average, over the 18.6–year tidal cycle, of the tidal boundary using a calculation that accounts only for

the daily location of the higher high tide. *See John & Stella Kenedy Mem'l Found. v. Dewhurst,* 90 S.W.3d 268, 272 (Tex.2002). "[T]he vertical difference between these two tidal datum planes is very slight along the Texas coast, varying from zero in many inland bays to about 0.1 foot along the open Gulf coast." William Gardner Winters, Jr., *The Shoreline for Spanish and Mexican Grants in Texas,* 38 TEX L. REV. 523, 530 (1960) (citing Texas Surveyors Ass'n, *Report of Riparian Boundary Committee* (Mar. 21, 1957)).

land gradually or imperceptibly added to or taken from his shoreline"); *City of Corpus Christi v. Davis*, 622 S.W.2d 640, 642, 644 (Tex.App.-Austin 1981, writ ref'd n.r.e.) (noting that landward advance of tide and attendant shoreline erosion causes upland owner to lose title to state when dry land becomes submerged) (citing *State v. Balli*, 144 Tex. 195, 190 S.W.2d 71, 100 (1944)). As a result of these forces, what was once dry land conveyed by the Menard Grant has returned to state ownership as the mean higher high-tide line reaches further inland. *See TH Invs.*, 218 S.W.3d at 195 (holding that state gained ownership of tract that became submerged through indistinguishable effects of erosion and subsidence).

■ The State could not divest itself of title to any submerged land by facilitating the replenishment of the beaches on that land. "Accretions along the shores of the Gulf of Mexico and bays which have been added by artificial means do not belong to the upland owners, but remain the property of the State." *Lorino*, 175 S.W.2d at 414; *accord Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envt'l Protection*, —— U.S. ——, ——, 130 S.Ct. 2592, 2611, 177 L.Ed.2d 184 (2010) (Florida law); *see Davis*, 622 S.W.2d at 646 (applying presumption that state holds title to land covered by sea when reclamation project began).

### D. Conclusion

The State's evidence proves, as a matter of law, its entitlement to the submerged land it claims, because the Porrettos' title is valid only to the meanders—their title stops short of any submerged land. We therefore hold that the trial court erred in declaring the Porrettos to be owners of the submerged land and in denying the State's amended plea to the jurisdiction on the Porrettos' claims for a declaration of title.

## II. Inverse Condemnation Claims

■ The State also challenges the legal sufficiency of the evidence that the State's actions with respect to Porretto Beach or PBW constituted a taking. The Texas Constitution prohibits the taking of private property for public use without adequate compensation. TEX. CONST. art. I, § 17. If the government appropriates private property without paying adequate compensation, the property owner may recover the resulting damages in an inverse condemnation suit. *Westgate, Ltd. v. State*, 843 S.W.2d 448, 452 (Tex.1992). "An inverse condemnation may occur when the government physically appropriates or invades the property, or when it unreasonably interferes with the landowner's right to use and enjoy the property, such as by restricting access or denying a permit for development." *Id.*

■ Whether government action amounts to a taking is a question of law that we review de novo. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex.1998) (whether zoning ordinance constituted compensable taking); *State v. Heal*, 917 S.W.2d 6, 9 (Tex.1996) (whether property owners could seek compensation for diminution in value of property caused by impaired access after receiving compensation for value of land taken). To amount to a regulatory taking, the governmental action must, at a minimum, create a "current, direct restriction on the property's use." *Westgate*, 843 S.W.2d at 452. "[P]ublicly targeting a property for condemnation, resulting in economic damage to the owner, generally does not give rise to an inverse condemnation cause of action unless there is some direct restriction on use of the property." *Id.* at 453.

### A. The takings evidence

As support for their takings claims, the Porrettos point to the GLO's actions in:

(1) Representing, in June 23, 1997 correspondence from its staff attorney concerning proposed jet ski concessions, that "the State does not recognize any claim of private ownership of land in front of the seawall," and that the State owned all the land covered by the Beach Replenishment Project, in front of (seaward of) the seawall;

(2) Notifying Galveston County Appraisal District that "there are no private beach owners south of the seawall" during an October 1997 Galveston Park Board meeting;

(3) Authoring, through senior deputy commissioner and general counsel, an editorial published in the *Galveston County Daily News* in July 1997, claiming all beaches in front of the Galveston seawall as state-owned property;

(4) Executing a lease of submerged land, as grantor, to the City of Galveston;

(5) Requesting that the State be substituted as the owner of portions of the property in the Galveston County real property records; and

(6) Claiming state ownership of the property in this court proceeding.

The trial court determined, however, that the takings occurred on specific dates: October 13, 1994—the date the State leased the submerged property to the City of Galveston for the beach renourishment project—for PBW, and June 23, 1997—the date of the correspondence from the GLO staff attorney about the proposed jet ski concession-for Porretto Beach. The jury's fair market value findings for the properties also hinge on these dates. We therefore determine whether the specific acts occurring on these dates support the taking claims. *Cf. Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000) (observing that, absent objection, court must measure sufficiency of evidence under charge submitted).

### B. Analysis

■ With respect to PBW, we agree with the State that its lease to the City is no evidence of a taking. The October 13, 1994 lease expressly declares the parties' intent for the establishment of a public recreation area on the "state-owned submerged lands" improved by the beach renourishment project. The Porrettos may assert a claim of title only for the property above the mean higher high-tide line, which the State does not claim to own, and its lease does not purport to convey.

■ With respect to the remainder of Porretto Beach, the June 23, 1997 correspondence authored by the GLO staff attorney is not the kind of direct restriction on use of the property that supports an inverse condemnation claim, particularly here, where the State later expressly disavowed any claim to land other than the submerged land to which it was entitled. *See Westgate,* 843 S.W.2d at 453; *see also TCI West End, Inc. v. City of Dallas,* 274 S.W.3d 913, 918 (Tex.App.-Dallas 2008, no pet.) (Texas Historical Commission's lawsuit to enforce statutory right to seek damages for destruction of historic structure or property did not constitute act to support regulatory takings claim; suit did not allege facts sufficient to show Commission's lawsuit caused private property owner to suffer physical invasion of property or destroyed all economically viable use of property; possibility that trial court might create constructive trust sometime in future does not destroy all economical viable use of property, nor does it unreasonably interfere with owner's use and enjoyment of property); *Texas Bay Cherry Hill, L.P. v. City of Fort Worth,* 257 S.W.3d 379, 396 & n. 6 (Tex.App.-Fort Worth 2008, no pet.)

(observing that city employees' and officials' statements to press and/or to community that plaintiff was absentee owner whose property was "mismanaged, unsafe for habitation, crime-ridden or otherwise not suitable as apartment dwellings [and was] going to be closed or condemned," and exclusion of plaintiff's apartments from city's list of available housing for hurricane evacuees were not regulatory acts that could provide basis for regulatory takings claim); *Wilkinson v. Dallas/Fort Worth Int'l Airport Bd.*, 54 S.W.3d 1, 14–15 (Tex.App.-Dallas 2001, pet. denied) (holding that allegations that included bad faith and premature announcement of runway expansion project, refusal to include certain landowners in mitigation program, and destruction of areas adjacent to appellants' neighborhood, all of which decreased market value of appellants' property, did not amount to physical or legal restriction of property use required for inverse condemnation claim).

■■■■ As we noted in *Porretto I*, the title is central to the Porrettos' claims, as they bear the burden to prove that they own the property allegedly taken by the State. 251 S.W.3d at 711; *see Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 644 (Tex.2004) ("It is fundamental that, to recover under the constitutional takings clause, one must first demonstrate an ownership interest in the property taken."). The record does not identify the specific portion and value, if any, of the Porrettos' property that the State allegedly took. Essential to the regulatory takings analysis is whether the privately-held strip of land has any economically viable use, that is, whether the property owner has any distinct investment-backed expectations for its development. *See Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 672 (Tex. 2004) (quoting *Penn Central Transp. Co.*

*v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)); *Mayhew*, 964 S.W.2d at 936 ("[A] regulatory taking occurs when governmental regulations deprive the owner of all economically viable use of the property or totally destroy the property's value."); *see also Barto Watson, Inc. v. City of Houston*, 998 S.W.2d 637, 641 (Tex.App.-Houston [1st Dist.] 1999, pet. denied); *Texas Bay Cherry Hill, L.P.*, 257 S.W.3d at 396 (holding that, even assuming city's adoption of redevelopment plan was regulation, it did not constitute taking; plan did not compel property owner to suffer physical invasion of its property or deprive owner of all economically viable use of property, nor did it constitute unreasonable interference with owner's right to use and enjoy property). The contours of the Porrettos' private holding as well as any pre-existing public easements and restrictions on its development all factor into this analysis. *See Sheffield Dev. Co.*, 140 S.W.3d at 672–73 (quoting *Mayhew*, 964 S.W.2d at 932–33); *see generally Gulf View Courts, Inc. v. Galveston Cnty.*, 150 S.W.2d 872, 873 (Tex.Civ.App.Galveston 1941, writ ref'd) (affirming injunction requiring private beach owners to remove permanent buildings from County's seawall easement and declaration that County had right to maintain sand dump on its right-of-way). The Porrettos' takings claim, without any evidence of their ownership interest and the State's invasion of it, cannot stand.

The State's use of state-owned submerged land does not effect a taking. Neither the State's lease of the land nor the GLO's letter supports the Porrettos' takings claims. The record does not elsewhere identify the property actually owned by the Porrettos or contain any evidence that government action by the State deprived them of the use of their property, as opposed to state use of State-owned submerged land. The character of the

lease—to allow for a beach replenishment project on submerged land-does not restore to the Porrettos the submerged land they lost by time and tide. More than a half century ago, the Texas Supreme Court held that artificial accretions to submerged land inure to the benefit of the State. *Lorino*, 175 S.W.2d at 414. Accordingly, the Porrettos have failed to establish that the State took their private property for public use without adequate compensation in violation of article I, section 17 of the Texas Constitution. *See Mayhew*, 964 S.W.2d at 937–38 (reversing and rendering judgment against plaintiffs on inverse condemnation claim because fact findings made by trial court after bench trial and relied on by plaintiffs were insufficient to constitute taking). We reverse the trial court's judgment on Porrettos' inverse condemnation claims against the State and render judgment that they take nothing on those claims.

### III. Ripeness of Open Beaches Act Challenge

According to the State, the trial court erred in granting declaratory relief on the Porrettos' constitutional challenge to the Open Beaches Act because it was not ripe for decision. "Ripeness is an element of subject matter jurisdiction." *Mayhew*, 964 S.W.2d at 928. In considering whether a claim is ripe, we consider whether, at the time a lawsuit is filed, the facts are sufficiently developed "so that an injury has occurred or is likely to occur, rather than being contingent or remote." *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851–52 (Tex.2000) (quoting *Patterson v. Planned Parenthood of Houston*, 971 S.W.2d 439, 442 (Tex.1998)); *Harris Cnty. Mun. Util. Dist. No. 156 v. United Somerset Corp.*, 274 S.W.3d 133, 138–39 (Tex.App.-Houston [1st Dist.] 2008, no pet.). A claim is not ripe if it concerns "uncertain or contingent future events that may not occur as anticipated or may not occur at all." *Gibson*, 22 S.W.3d at 852 (quoting *Patterson*, 971 S.W.2d at 442). "A case is not ripe when determining whether the plaintiff has a concrete injury depends on contingent or hypothetical facts, or upon events that have not yet come to pass." *Id.* (citing *Patterson*, 971 S.W.2d at 443). A threat of harm can constitute a concrete injury, but the threat must be "direct and immediate" rather than conjectural, hypothetical, or remote. *Id.* (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 152, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)).

The Porrettos have not identified any property right threatened with imminent injury or injured by the statutory recognition of the public's right to unrestricted access to the Gulf shore along state-owned beaches or where the public has "acquired a right of use or easement to or over an area by prescription, dedication, or has retained a right by virtue of continuous right in the public." Tex. Nat. Resource Code Ann. § 61.011(a) (West 2001). The Open Beaches Act does not create a public beach easement where none exists. *Brannan v. State*, 365 S.W.3d 1, 9 (Tex. App.-Houston 2010, pet. filed) (mem. op. on reh'g) (citing *Arrington v. Mattox*, 767 S.W.2d 957, 958 (Tex.App.-Austin 1989, writ denied)). In the trial court, the Porrettos did not identify any property right they currently hold and held before the enactment of the Open Beaches Act that has been threatened or lost as a result of its application. We therefore hold that subject-matter jurisdiction does not exist over the Porrettos' challenge to the Open Beaches Act.

### IV. Discovery Sanctions

The State also challenges the trial court's imposition of sanctions requiring the State to pay the Porrettos' attor-

ney's fees and expenses based on a finding of discovery abuse. We review the imposition of sanctions for an abuse of discretion. A trial court abuses its discretion if it issues a discovery sanction in an arbitrary or unreasonable manner, or without reference to guiding rules and principles. *In re Colonial Pipeline Co.*, 968 S.W.2d 938, 941 (Tex.1998) (orig. proceeding).

■ Approximately six weeks before trial, the Porrettos served the State with a request for production. The parties made arrangements for the Porrettos' attorneys to visit the GLO offices in Austin, and the State gave them access to review its archived correspondence and other materials kept in the ordinary course of business. The State did not conduct a previous search through its archives to select responsive documents and organize them according to each request. In their motion for sanctions, the Porrettos complained of the State's failure to review its own files and select responsive documents.

■ Texas Rule of Civil Procedure 196.3 governs the production of documents and tangible things during the discovery process. With respect to the organization of produced materials, the rule provides that "[t]he responding party must either produce documents and tangible things as they are kept in the usual course of business or organize and label them to correspond with the categories in the request." TEX.R. CIV. P. 196.3(c). Much as a trial court cannot compel a party to create indices or reduce information to tangible form in response to a request for production, a trial court cannot sanction a party for failing to organize responsive materials according to the method its opponent prefers when the discovery response complies with an alternate method permitted under the rules. *Cf. In re Colonial Pipeline Co.*, 968 S.W.2d at 941 (holding that trial court abused its discretion in ordering party to produce inventory in response to request

for production); *McKinney v. Nat'l Union Fire Ins. Co.*, 772 S.W.2d 72, 73 n. 2 (Tex.1989) (declaring that rule governing requests for production "cannot be used to force a party to make lists or reduce information to tangible form"). Because the State's response to the Porrettos' request for production did not violate the discovery rules, the trial court abused its discretion in imposing sanctions.

## Conclusion

We hold that the trial court erred in denying the State's amended plea to the jurisdiction with respect to the submerged land formerly held by the Porrettos, because the State adduced evidence that it is the owner of that submerged land. Accordingly, we dismiss for lack of jurisdiction the Porrettos' claims against the GLO and Commissioner Patterson seeking a declaration of title. We further hold that the Porrettos' inverse condemnation claims with respect to land above the mean higher high-tide line are without merit, because the state actions challenged were not takings, and no legally sufficient evidence accurately identifies or values their private property interest, nor the State's encroachment of it. We hold that the trial court also lacked subject-matter jurisdiction over the Porrettos' constitutional challenge to the Open Beaches Act. We therefore reverse the judgment and (1) dismiss for lack of subject-matter jurisdiction the Porrettos' title claims and their Open Beaches Act challenge; and (2) render judgment that the Porrettos take nothing on their inverse condemnation claims. Finally, we hold that the trial court erred in imposing discovery sanctions on the State and, therefore, reverse the award of attorney's fees assessed as sanctions against the State.