# Supreme Court of Texas

## No. 24-1070

River Creek Development Corporation and City of Hutto, Texas,

*Petitioners*,

v.

Preston Hollow Capital, LLC; 79 HCD Development, LLC; Public Finance Authority; and U.S. Bank National Association,

*Respondents*

On Petition for Review from the
Court of Appeals for the Third District of Texas

JUSTICE HAWKINS, joined by Chief Justice Blacklock, concurring in the judgment.

Our Legislature has determined that before a local government corporation may take on public debt to finance public works, it must first submit the debt instrument to the Attorney General of Texas for examination and approval. *See* TEX. TRANSP. CODE §§ 431.070, .071. This type of safeguard exists "to protect the particular locality and its inhabitants against the imposition of unauthorized or illegal obligations." *City of Galveston v. Mann*, 143 S.W.2d 1028, 1035 (Tex.

1940). It seeks to ensure, in other words, that municipalities act lawfully before saddling their taxpayers with substantial debt.

The City of Hutto created a local government corporation. That corporation contracted with an out-of-state entity to issue $17.4 million in public debt to fund city improvements. But it skipped the submission to the Attorney General. No examination occurred. No determination of lawfulness was made. No approval was issued.

What consequences follow from that apparent statutory violation? That is the key question this case presents, and the parties offer us two options. On one side, the City argues the consequence is the automatic and total invalidity of the debt instruments. The City has already benefited from many millions of dollars in public works, but now claims that its promises to pay the loans that financed those improvements cannot be enforced. On the other side, the financiers argue the *sole* consequence is the loss of the statutory incontestability defense available to instruments that have been examined and approved. They argue that despite the statutory term "shall," submission to the Attorney General is a purely optional, take-or-leave invitation that confers a benefit if accepted and no real consequence if declined.

I find both positions unsatisfactory. The statute does not expressly provide for automatic invalidity, a conspicuous omission when other statutory schemes do just that. *See, e.g.*, TEX. GOV'T CODE §§ 1371.059(b), 1202.003(c). At the same time, Respondents' view would turn the statute's mandatory "shall" into a permissive "may"; that cannot be right. There must be some *real* consequence when municipal

2

managers and their financiers together violate a critical statutory measure designed to protect our State's taxpayers from spendthrift (or worse) local governments.

Mindful of our precedents on forfeiture, estoppel, and the general principles of adversarial presentation, I cannot fault the Court for declining to set aside the parties' positions and carve a third path that better hews to the legislative directive. We risk error when we depart from the arguments the parties have developed and the lower courts have tested; in general, it is prudent to avoid adopting legal conclusions the parties themselves have not raised. With some reluctance, but with the utmost respect for my colleagues, I therefore concur in the judgment.

But I hope that in a future case, with a more robust exploration from the parties of the relevant textual considerations and contours, we can better assess what this statute means. The Court's decision today resolves this particular dispute as it was presented to us, consistent with what the parties requested. It expressly contemplates that the failure to seek Attorney General approval under Chapter 431 may carry other consequences. When the opportunity arises, we should say what they are.

The Court's second holding—that the Public Improvement District Assessment Act authorizes assessment-funded reimbursement of an out-of-state issuer's bond-issuance costs—raises similar concerns. Section 372.023(h) limits reimbursable bond-issuance costs to bonds issued *by Texas issuers*, not out-of-state entities. TEX. LOC. GOV'T CODE §§ 372.023(h), .024; TEX. GOV'T CODE § 1201.002(1). This case presents a creative workaround: by routing the payments through a series of

intermediary arrangements, the foreign conduits get away with doing indirectly what the statute forbids them from doing directly. Today, the Court blesses that loophole.

I respect the Court's view that when it comes to public financing of municipal works, predictability and formalism carry paramount importance. But make no mistake: today's decision effectively eliminates a critical legislative measure to protect local taxpayers from spendthrift municipalities and the unscrupulous out-of-state financiers seeking to prey on them. The takeaway from today's decision is that local governments may in fact use taxpayer-funded assessments to pay out-of-state issuer costs—as long as they do so through creative transactions dressed up as "installment sales contracts."

If the Legislature objects, it will be easy enough to say so.

# I

In a future case, I hope the parties will better explore what consequences might flow from the failure to seek the Attorney General approval that Chapter 431 mandates. Here is the relevant statutory text:

> (a) A corporation shall submit a bond or note authorized under Section 431.070 and a contract supporting its issuance to the attorney general for examination.

> (b) If the attorney general finds that the bond or note, and any supporting contract are authorized under this chapter, the attorney general shall approve them.

> (c) After approval by the attorney general, a bond, note, or contract may not be contested for any reason.

4

TEX. TRANSP. CODE § 431.071. The parties have offered two theories on what this text requires. I will explain why I believe each fails. I then will offer a third approach.

**A**

First is the view Petitioners and the State advance: the consequence of noncompliance is the automatic invalidity of the instruments. The Court rejects that view, and I would, too. As the Court correctly observes, the Legislature knows how to declare contracts void for failure to comply with mandatory procedural requirements. *See, e.g.*, TEX. GOV'T CODE § 2254.110 ("A contract entered into or an arrangement made in violation of this subchapter is void as against public policy . . . ."); *id.* § 1371.059(a), (b) (providing for incontestability if an obligation under the Chapter is approved by the Attorney General and expressly stating that an obligation is "not valid, binding, or enforceable unless the obligation is approved by the attorney general"); *id.* § 1202.003(a), (c) (requiring an issuer to submit a public security to the Attorney General and stating that "the issuance of a public security except in compliance with this chapter is prohibited"). It chose not to do so in Section 431.071.

Where the Legislature has used voidness language in closely parallel statutes and conspicuously omitted it from the statute before us, we are reluctant to read voidness in by structural inference. *See Liberty Mut. Ins. Co. v. Adcock*, 412 S.W.3d 492, 497 (Tex. 2013) ("When the Legislature expresses its intent regarding a subject in one setting, but, as here, remains silent on that subject in another, we generally abide by the rule that such silence is intentional."); *cf. PHI, Inc. v. Tex.*

5

*Juv. Just. Dep't*, 593 S.W.3d 296, 305 (Tex. 2019) ("[N]o court has the authority, under the guise of interpreting a statute, to engraft extra-statutory requirements not found in a statute's text."). That is especially so here, in the context of sophisticated public debt instruments, where automatic voidness would present special considerations and destabilize the public fisc and the ability of municipalities to finance public improvements. This is enough to reject Petitioners' and the State's view.

**B**

The second view comes from Respondents: the *sole* consequence for disregarding subsection (a) is the loss of the benefit described in subsection (c), the statutory defense of incontestability. This, too, cannot be correct, because it would render the verbs "shall" and "may" interchangeable.

To illustrate, suppose subsection (a) read "may submit" rather than "shall submit." What, according to Respondents, would be different? Nothing. In either case, if a municipality submits an instrument and received approval, it is inconstestable. If it decides not to submit an instrument, then the instrument is contestable like any ordinary contract. Respondents' view thus renders the Legislature's use of "shall" a nullity. The Court wisely rejects that approach. *See Image API LLC v. Young*, 691 S.W.3d 831, 842 (Tex. 2024) (rejecting interpretation of statute that would transform "must" into "may").

Moreover, Respondents' view invites substantial practical problems. Consider how the rule operates from the perspective of the parties most likely to skirt Attorney General review. A corporation contemplating a transaction of dubious legality faces a choice: submit

6

the instruments to the Attorney General, or skip the process entirely. Under Respondents' view, submission carries real risk. If the Attorney General reviews the documents and concludes they are not authorized, the entire deal collapses on the front end. By contrast, *not* submitting carries only the risk of later contestability—a risk that may never materialize if no one ever sues, and that, even if someone does, can be defended against by invoking the disruption that a declaration of invalidity would cause. This produces an incentive structure exactly opposite the one the Legislature intended. The parties with the most reason to avoid Attorney General examination—the parties whose deal is most legally questionable—have the strongest incentive *not to submit*.

The Public Finance Authority's own brief illustrates the ubiquity of this problem. PFA represents that it has issued bonds for 78 projects in Texas since 2012, totaling $4.9 billion. Not one of those 78 projects was submitted to the Attorney General for examination. Not one was challenged in any court of any State—until this case. The State's chief legal officer, through widespread practice norms, is being systematically cut out of a mandatory role the Legislature assigned him.

All of this is reason to laud the Court's rejection of Respondents' position.

## C

In my view, there must be some real consequence for the failure to seek Attorney General approval. I offer here one thought that future litigants may wish to explore in an appropriate case.

It seems to me that the proper consequence must lie somewhere between the poles, and *Image API*'s "logically necessary" inquiry tells us

where to find it. *Id.* at 843. The purpose of Section 431.071 is to ensure substantive compliance with Texas law before public-finance instruments obligate public funds. Attorney General examination is the means by which that purpose is ordinarily served. When parties skip the examination, the statutory process does not run—and the instruments are unverified.

The logically necessary consequence is the one that flows from this gap: substantive compliance must be verified some other way. I would put it to the party seeking to enforce the instruments to secure that verification.

Under that approach, the failure to submit a Chapter 431 instrument for Attorney General examination as required by Section 431.071(a) would deprive the instrument of any presumption of regularity or statutory authorization that would otherwise attach. In any challenge to the validity of the instrument, it would fall to the party seeking to enforce or rely on its consequences to affirmatively demonstrate lawfulness within the meaning of Section 431.071(b)—that is, that the instrument complies with the substantive law that the Attorney General would have examined had submission occurred.

This approach would not automatically invalidate prior unsubmitted transactions, but it would make them easy to invalidate in the event they are actually unlawful. Sophisticated parties might attempt Chapter 431 financings without Attorney General submission, but they would do so with the knowledge that the instruments are presumptively unlawful, and that the presumption of regularity is not available. This, I submit, would give the mandatory submission duty

8

meaningful effect and track the protective function the Legislature assigned to the Attorney General. And in light of our decisions allowing taxpayers to challenge certain tax assessments, *see Busse v. S. Tex. Indep. Sch. Dist.*, ___ S.W.3d ___, 2026 WL 1279764, at *6 (Tex. May 8, 2026), and unlawful expenditures, *see Jones v. Turner*, 646 S.W.3d 319, 324 (Tex. 2022), municipalities would face a real incentive to seek approval.

I of course acknowledge that declaring public debt instruments invalid will always raise difficult remedial questions with no obvious answers. In the case now before us, the parties have invoked the principle that when a contract is declared void, parties must be restored to their pre-contract positions. *See In re Tex. Ass'n of Sch. Bds., Inc.*, 169 S.W.3d 653, 659 (Tex. 2005). But it is not clear how a court could restore the *status quo ante* to these major public works projects financed with out-of-state bonds; cities cannot return their new roads to the contractor for a refund. Other remedies may (or may not) be available. *See, e.g.*, *City of Denton v. Mun. Admin. Servs., Inc.*, 59 S.W.3d 764, 770 (Tex. App.—Fort Worth 2001, no pet.) ("When a court holds a contract void, not merely voidable, a party may seek recovery for amounts paid under the common law theory of quantum valebant for money had and received." (citation omitted)); *see also Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 732-33 (Tex. 2018) (discussing circumstances under which a party may recover under common law doctrine of quantum meruit).

Whatever the answer, nothing in the Court's opinion forecloses the possibility that other consequences may flow from the failure to

comply with Chapter 431, and future litigants are free to develop arguments along those lines. *Ante* at 7 n.2. To be clear, nothing in my opinion (or the Court's) should be read to suggest that a municipality could avoid paying for what it received. No loophole in our law allows a municipality to receive millions of dollars in public improvements free of charge.

## II

Shifting back to the actual case now before us: Are the underlying instruments unlawful? The Court says no, at least as to the Interlocal Agreement under the PID Act. Color me skeptical (or *dubitante*, if you like).[1]

The PID Act presents a complex statutory scheme in service of a simple legislative directive to municipalities: do not use taxpayer-funded assessments to pay the issuance costs of out-of-state bond issuers. TEX. LOC. GOV'T CODE §§ 372.023(h), .024; TEX. GOV'T CODE § 1201.002(1). Here, the City used taxpayer-funded assessments to pay the issuance costs of out-of-state bond issuers. Yet the Court finds no statutory violation—because the City structured this transaction as an "installment sales contract," under which Peter does not pay Paul directly, but instead pays Mary, knowing Mary in turn routes the money to Paul.

---

[1] The Court does not address the lawfulness of the Loan Agreement and Promissory Note because the Petitioners forfeited their PID Act challenge to those instruments. I agree that those challenges are forfeited, and I am reluctant to say more about them in the absence of developed analysis below testing competing understandings.

Here are the relevant statutory considerations. Section 372.023 specifies the methods by which improvement costs may be paid, and it specifically provides limitations governing special assessments payable in installments. TEX. LOC. GOV'T CODE § 372.023. Per subsection (d), the costs may be paid through (1) an installment sales contract, (2) a temporary note or time warrant, or (3) "[t]he issuance of bonds under Section 372.024." *Id.* § 372.023(d). And per Section 372.023(h): "The costs of any improvement include . . . all costs incurred in connection with the issuance of bonds under Section 372.024." *Id.* § 372.023(h). Section 372.024 in turn requires that those bonds be issued under Subtitles A and C, Title 9, of the Government Code. *Id.* § 372.024. And Section 1201.002(1) of that Code defines an "issuer" as a Texas governmental entity "of this state." TEX. GOV'T CODE § 1201.002(1)(A).

Weaving those statutory threads together, Petitioners' argument is simple enough: reimbursement of bond-issuance costs from PID assessments is permissible only when the bonds were issued by a Texas issuer under Section 372.024. PFA's bonds were not. They were issued under Wisconsin law, by a Wisconsin governmental entity. Therefore, Section 372.023(h) does not authorize reimbursement of those costs. The PID Act, then, makes the Interlocal Agreement unlawful at least in part.

The Court today rejects that view, letting stand the court of appeals' structural argument that goes something like the following. The PFA bonds were issued in a separate transaction to which Petitioners were not parties, and the Interlocal Agreement does not pay PFA's costs directly. All the Interlocal Agreement does is allow the City to pay River Creek's "indebtedness," which is authorized by Section

11

372.026(f)'s "issued to pay the corporation's costs of issuance" language. TEX. LOC. GOV'T CODE § 372.026(f). Once River Creek agreed to repay PFA an amount that included PFA's bond-issuance costs, those costs (in Respondents' view) became "the corporation's"—that is, River Creek's—and Section 372.023(d)(1) authorizes assessment-funded reimbursement through an installment sales contract. *Id.* § 372.023(d)(1).

In my view, the web of transactions before us is hard to square with Section 372.023(h)'s "under Section 372.024" restriction. *Id.* § 372.023(h). Subsection (h) is properly understood to limit reimbursable bond-issuance costs to bonds issued *by Texas issuers*—that is what "under Section 372.024" must mean. To hold that this limitation may be evaded by routing the transactions through a local government corporation that incorporates the foreign issuer's costs into its own debt renders the Texas-issuer requirement a nullity. *See* TEX. GOV'T CODE § 311.021(2); *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008) (noting courts must not interpret a statute in a manner that renders any part of it meaningless or superfluous); *cf.* Scalia & Garner, READING LAW 167 (discussing whole-text canon); *id.* at 174 (discussing canon against surplusage); *id.* at 180 (discussing harmonious-reading canon).

Furthermore, Section 372.023(d)(1) says nothing about *which* costs are payable through an installment sales contract. Instead, it merely states that "[c]osts payable from a special assessment" may be paid through an installment sales contract. TEX. LOC. GOV'T CODE § 372.023(d)(1). I am not aware of any provision designating foreign

conduit bond issuers' costs of issuance as "costs payable." Subsection (h) only includes the costs of issuing bonds for Texas entities. *Id.* § 372.023(h). Municipalities only exercise authority pursuant to powers granted to them by the state. *See Payne v. Massey*, 196 S.W.2d 493, 495 (Tex. 1946) ("Municipalities are creatures of our law and are created as political subdivisions of the state as a convenient agency for the exercise of such powers as are conferred upon them by the state."). In a future case, if a bond-issuer were tasked with affirmatively proving compliance with Texas law (as I set out above, *see supra* Part I), I am doubtful Section 372.023(d)(1) would properly authorize municipalities' use of interlocal agreements to cover the costs of issuance for foreign bond issuers.

And while the Court is correct that Petitioners have not properly preserved their challenges to the Promissory Note and Loan Agreement, I cannot ignore that the structural integration of the agreements supports treating them, for purposes of this analysis, as a single transaction. The Loan Agreement, the Note, and the Interlocal Agreement were executed on the same day, by overlapping signatories, with cross-references throughout. The Interlocal Agreement directs the City's Installment Payments not to River Creek but to the bond trustee—a routing that bypasses River Creek as paymaster and delivers assessment dollars directly into the bond-debt-service stream. The Loan Agreement explicitly recites that PFA shall issue its bonds "in connection with this Loan Agreement." The State's amicus brief aptly describes the agreements as "inextricabl[y] interconnect[ed]." Under these circumstances, the Court's formalism is far removed from the

13

reality of this financial arrangement. *Cf. Gregory v. Helvering*, 293 U.S. 465, 469-70 (1935) (recognizing that substance may control over form when "devious" transactions are made with no legitimate substantive purpose).

### III

I highlight an additional consideration that future litigants (and the Legislature) may wish to consider further. In my view, Chapter 1202 of the Government Code provides an independent basis for concluding that the Promissory Note in this case required Attorney General review. The parties do not adequately develop this argument, and the Court does not address it, but in a future case, it may be outcome-dispositive.

Section 1202.003 requires submission of public securities to the Attorney General for examination and approval. TEX. GOV'T CODE § 1202.003(a). The Attorney General "shall" approve the public security if it is "authorized." *Id*. § 1202.003(b)(1). And critically: "[T]he issuance of a public security except in compliance with this chapter is prohibited." *Id*. § 1202.003(c). That is *explicit* voidness language—the kind the Court correctly observes is absent from Section 431.071. And I fail to see why it would not apply here.

Section 1202.001(3) sets out to define "public security" as "an instrument, including a . . . note . . . that: (A) is issued or incurred by an issuer under the issuer's borrowing power . . . and (B) is represented by an instrument issued in bearer or registered form or is not represented by an instrument but the transfer of which is registered on books maintained for that purpose by or on behalf of the issuer." *Id.* § 1201.001(3). Section 1202.001(2) defines "issuer" to include "an

14

agency, authority, board, body politic, department, district, instrumentality, municipal corporation, political subdivision, public corporation, or subdivision of this state." *Id.* § 1202.001(2).

Here, the Promissory Note meets these criteria. It is a "note" within the meaning of Section 1202.001(3). It reflects River Creek's promise to pay $17.4 million plus interest from a defined revenue stream. It was issued by River Creek, a "public corporation" of Texas. It is plainly a "public security." And it was never submitted to the Attorney General for approval. It would appear, then, that Chapter 1202 would render the Promissory Note invalid.[2]

Or at least, so goes my analysis based on the materials and arguments provided to us. There may be considerations relevant to Chapter 1202 that were not adequately developed below or in this Court, and since the parties have not fully canvassed its contours, neither will I. I merely flag the issue for future litigants and courts to consider more robustly whether, in light of the Court's approach to Chapter 431, Chapter 1202 supplies an independent ground for Attorney-General-review-related invalidity. Future challengers in similar transactions should examine whether Chapter 1202 provides the textual hook the Court finds missing in Chapter 431.

-----

[2] Respondents invoke Section 1201.041(1) to argue that public securities must be negotiable, and since this Promissory Note expressly states it is not a negotiable instrument, it must fall outside Section 1202. But Section 1201.041 is not a definitional provision—Section 1201.002(2) is, and it does not require negotiability. Section 1201.041 is *descriptive*—it tells courts how to treat instruments that have already been determined to be public securities. These are operative consequences that follow from public-security status; they are not threshold criteria for that status.

## IV

An out-of-state conduit issuer, partnered with a sophisticated bond purchaser, was able to extract over $17 million from Texas property owners through a transaction that none of the Texas officials charged with reviewing such transactions ever examined or approved. Based on the particular arguments the parties have presented, and cabined by the particular relief they sought below, the Court declines to invalidate this arrangement. For the foregoing reasons, I do not disagree with the Court's judgment line.

But I reiterate that if the Legislature wants local governments to submit these instruments to the Attorney General, it need only specify a sufficiently severe consequence for noncompliance. And if the Legislature disapproves of the PID Act loophole the Court endorses today, it is easy enough to say so.

Kyle D. Hawkins
Justice

**OPINION FILED:** June 12, 2026

16